## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM CURTIS,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **NO. 14-0786** |
| | : | |
| **JOHN WETZEL, et al.,** | : | |
| **Defendants** | : | |

### M E M O R A N D U M

**STENGEL, J.**                                                         **August 28, 2015**

William Curtis, a state prisoner housed at the State Correctional Institution --
Graterford, is currently serving a life sentence without the possibility of parole after being
convicted of murder in 1982.  He brings this action against fourteen defendants, including
the Secretary and Deputy Secretary of the Pennsylvania Department of Corrections, and
the Superintendent and various other officials and employees of the prison.  Pursuant to
42 U.S.C. § 1983, Mr. Curtis alleges that the defendants violated his constitutional rights
by retaliating against him for refusing to sign a Sex Offender Treatment Plan ("SOTP")
form.  Defendants John Wetzel,[1] Michael Klopotoski,[2] and Michael Wenerowicz[3] have
jointly filed one motion to dismiss to which the plaintiff has responded.  Two other
defendants, that is, Defendants Robin Lewis[4] and Wendy Shaylor,[5] filed a separate joint
motion to dismiss to which the plaintiff has also responded.  For the following reasons, I
will grant these motions in their entirety.

---

[1]  Defendant Wetzel is the Secretary of the PA Department of Corrections.  See Compl. ¶ 4.
[2]  Defendant Klopotoski is the Deputy Secretary of the PA Department of Corrections.  Id. ¶ 5.
[3]  Defendant Wenerowicz is the Superintendent at SCI-Graterford.  Id. ¶ 6.
[4]  Defendant Lewis is the Chief Hearing Examiner at SCI-Graterford.  Id. ¶ 7.
[5]  Defendant Shaylor is a Grievance Coordinator at SCI-Graterford.  Id. at 1.

## I. BACKGROUND[6]

The complaint alleges that on February 1, 2012, Defendants Jay Lane,[7] Francis Feilds,[8] Gary Olinger,[9] T. Bolton,[10] and Gerard Kelly[11] stated that Mr. Curtis must sign a tracking agreement to be released to general population.  See Compl. ¶ 20.  The document did not mention a specific type of treatment program required for the release.  Id. at ¶¶ 21-22.  A few days later, Mr. Curtis received a pass to report to an area known as J-Treatment Area, where he was questioned by Defendant Branner[12] about the reason Mr. Curtis was incarcerated.  Id. at ¶ 23.  Defendant Branner told Mr. Curtis that he was a convicted sex offender and he was being evaluated for placement in the sex offender program.  Id. at ¶ 24.  Mr. Curtis immediately responded that he had never pleaded guilty or been convicted of a sexual offense.  Id. at ¶ 25.  Ms. Banner allegedly responded, "If you do not 'play ball' with the program, you'll be quickly returned to solitary confinement."  Id. at ¶ 26.

Mr. Curtis was then summoned to Defendant Stewart's[13] office.  Id. at ¶ 27.  Defendants Bolton and Kelly were also present.  Defendant Stewart told Mr. Curtis that

---

[6] The facts are gleaned from the complaint and the extrinsic documents upon which it is based.  See GSC Partners, CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004).  For the purposes of these motions, they are presented in the light most favorable to the plaintiff, as the non-moving party, and are accepted as true with all reasonable inferences drawn in his favor.
[7] Defendant Lane is the Deputy Superintendent of Facilities Management at SCI-Graterford.  See Compl. ¶ 8.
[8] Defendant Feilds is the Major of the Unit Managers at SCI-Graterford.  Id. ¶ 9.
[9] Defendant Olinger is the Corrections Classification and Programs Manager at SCI-Graterford.  Id. ¶ 10.
[10] Defendant Bolton is the Unit Manager of J-Housing Unit and the Restricted Housing Unit at Graterford.  Id. ¶ 11.
[11] Defendant Kelly is the Counselor for J-Housing Unit at Graterford.  Id. ¶ 13.
[12] Defendant Branner is a Mental Health Facilitator at Graterford.  Id. ¶ 15.
[13] Defendant Stewart is Counselor at the Newside Housing Unit at Graterford. Id. ¶ 14.

the entire institution had heard about what happened at his meeting with Ms. Branner.  Id.
Defendant Bolton said that Defendant Lane said, "If [Mr. Curtis doesn't] do the Sex
Offender Treatment Program, that Lane would make sure that [he'll] be locked down
forever, in solitary confinement, on the restricted release list."  Id. at ¶ 28.  Defendant
Kelly then said, "If [Mr. Curtis] didn't cooperate and participate in the SOTP, that
[Defendant Kelly] would come down to Lower H-1 with a Lieutenant, and put the
handcuffs on [Mr. Curtis] so fast that [his] head will spin."  Id. at ¶ 29.

On March 20, 2012, Mr. Curtis was given a pass to be interviewed by Defendant
Birmingham[14] at the J-Treatment Area.  When he arrived, Mr. Curtis was ushered into a
classroom with about twenty-five other inmates.  Id. at ¶¶ 31-32.  Ms. Birmingham wrote
her name and the letters "SOTP" on the blackboard.  She then gave Mr. Curtis a
document to sign stating that Mr. Curtis "had committed a sexual offense or several
sexual offenses."  Id. at ¶ 32.  After reading it, Mr. Curtis wrote on the document, "[I]
was under an act of coercion and if [I] did not do this [I'd] be sent to the 'RHU' Solitary
Confinement."  Id. at ¶ 33.  Ms. Birmingham then ordered Mr. Curtis to leave her
classroom immediately.  Id. at ¶ 34.

Within twenty-four hours, Defendants Bolton and Kelly summoned Mr. Curtis to
Defendant Stewart's office for being disobedient where the alleged badgering and
disparaging comments increased.  Id. at ¶ 35.  Mr. Curtis was again threatened with
solitary confinement if he refused to sign the SOTP document.  Id. at ¶ 36.

---

[14]  Defendant Birmingham is a Mental Health Facilitator at SCI-Graterford.  See Compl. ¶ 16.

On March 29, 2012, Mr. Curtis was again given a pass to J-Treatment Area for another meeting with Defendant Birmingham.  She again attempted to have Mr. Curtis sign the document but Mr. Curtis again refused.  Id. at ¶ 37.  Later that day, several employees of the prison went to Mr. Curtis's cell to accompany him to the Unit Manager's Office.  Id. at ¶ 38.  At the Unit Manager's Office, Defendants Frank Regan[15] and Kelly were present.  Again, Mr. Curtis informed them that he had never been convicted of a sex crime.  Defendant Regan called Mr. Curtis a liar, and said that if it were up to him, he would lock Mr. Curtis up immediately.  Id. at ¶ 40.  Defendant Birmingham entered the office and again attempted to have Mr. Curtis sign the SOTP document indicating that Mr. Curtis had committed a sex crime.  Id.  Mr. Curtis again refused.  Id.

Defendant Kelly then issued a Disciplinary Misconduct Report based on Mr. Curtis's refusal to sign the document.  Id. at ¶ 41.  Mr. Kelly included in the report that Defendants John Wetzel and Michael Klopotoski had given Mr. Curtis a direct order to sign the SOTP document.  Id. at ¶ 42.  Mr. Curtis insists that at all times relevant within this complaint that he had never had any type of personal contact with Defendants Wetzel or Klopotoski, or any type of direct communications or correspondence with them.  Id. at ¶¶ 43-44.

On March 30, 2012, Defendant Regan wrote an "Other Report DC-ADM 802" stating that "[Mr. Curtis] is a danger to some person in the institution who cannot be protected by alternate means."  Id. at ¶ 45.  Later that evening, a Lieutenant and several

---

[15] Defendant Regan is the Unit Manager on the Newside Housing Unit at SCI-Graterford.  See Compl. ¶ 12.

guards came to Mr. Curtis's cell, placed him in handcuffs, and escorted him eventually to J-Housing Unit.  Id. at ¶ 46.

On April 5, 2012, a hearing was held on the misconduct report for Mr. Curtis's refusal to obey an Order.  The misconduct report was dismissed without prejudice.  Id. at ¶ 47.  Although the misconduct report was dismissed, Mr. Curtis remained in the restrictive housing unit because of Defendant Regan's Other Report.  Id. at ¶ 48.  Defendants Bolton and Kelly allegedly logged into the institution's computer and changed Mr. Curtis's status from administrative custody to disciplinary custody[16] which continued from May 2012 through July 2012.  Id. at ¶ 49.  Mr. Curtis insists that this change in status was an act of retaliation and personal animus against him.  Id. at ¶ 50.

Mr. Curtis filed a six count complaint alleging violations of the First Amendment (Count One), the Fifth Amendment (Count Two), and the Fourteenth Amendment (Count Three).  He also alleges that his rights under 37 Pa. Code § 93.11[17] were violated (Count Four).  In Count Five, Mr. Curtis alleges that the defendants violated his rights under various subsections of 63 P.S. § 1203, Chapter 41, known as the Professional Psychologists Practice Act.  Finally, in Count Six, Mr. Curtis alleges that the defendants

---

[16] According to the complaint, disciplinary custody status limits a prisoner's privileges to virtually no privileges at all.  For example, a prisoner on disciplinary custody status has no telephone, radio, or television privileges.  Visits are limited to immediate family members.  Commissary purchases are also extremely limited.  Mr. Curtis states that the denial of those privileges was in retaliation for his exercising his constitutional rights.  See Compl. ¶ 51.

[17] Title 37 of the Pennsylvania Administrative Code, Section 93.11(b) provides that "confinement in a restricted housing unit (RHU), other than under procedures established for inmate discipline, will not be done for punitive purposes. The Department will maintain written procedures which describe the reasons for housing an inmate in the RHU and require due process in accordance and with established principles of law for an inmate who is housed in the RHU. Inmates confined in the RHU will be reviewed periodically by facility staff."

violated his rights under various subsections of Pennsylvania's Administrative Code pertaining to Licensed Professional Counselors.

Mr. Curtis seeks compensatory damages of $12,000 from each defendant, punitive damages of $25,000 from each defendant, and costs.  In addition, he seeks a declaration that the acts and omissions of the defendants violated his rights under the Constitution of the United States.  See  Compl. ¶ 90.  He also seeks a preliminary and permanent injunction ordering: (1) Defendant Wetzel to rescind Mr. Curtis's restricted release solitary confinement and return him to the general population; and (2) Defendants Klopotoski and Wenerowicz to direct all fraudulent misrepresentations and any references that Mr. Curtis is a sex offender be erased and/or deleted from all records and files of the Department of Corrections.  Id. at ¶¶ 91, 92.

## II.  STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the sufficiency of the complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Following the Supreme Court decisions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), pleadings standards in federal actions have shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-211 (3d Cir. 2009); see also Phillips v. County of Allegheny, 515 F. 3d 224, 230 (3d Cir. 2008).

Therefore, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis.  First, the factual and legal elements of a claim should be separated.  The court must accept all of the complaint's well-pleaded facts as true but may disregard legal conclusions.  Iqbal, 556 U.S. at 679.  Second, a district court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."  Id.  In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to "show" such an entitlement with its facts.  Id.; see also Phillips, 515 F.3d at 234-235.  "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679.

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  As the Court held in Twombly, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."  Id. at 557.

Moreover, courts must liberally construe *pro se* complaints and "apply the applicable law, irrespective of whether [the] litigant has mentioned it by name."  Higgins

7

v. Beyer, 293 F.3d 683, 688 (3d Cir. 2002).  Thus, a *pro se* plaintiff's complaint, however inartfully pleaded, must be held to a less stringent standard than a formal pleading drafted by an attorney.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).

## III. DISCUSSION

Mr. Curtis has brought this action against the defendants pursuant to 42 U.S.C. § 1983, alleging violations of his First, Fifth, and Fourteenth Amendment rights.  He sues them in both their official and personal capacities.  Under 42 U.S.C. § 1983, a private party may recover in an action against any person acting under the color of state law who deprives the party of his or her constitutional rights.  Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and law, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 does not by itself confer substantive rights, but instead provides a remedy for redress when a constitutionally protected right has been violated.  Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985).  Therefore, in order to succeed on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) the violation of a right secured by the Constitution, and (2) that the constitutional deprivation was committed by a person acting under the color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).

### A.  Counts One and Three – Violations of First and Fourteenth Amendments

In Count One, Mr. Curtis claims that his First Amendment rights were violated when he was denied the right to respond to the false material statement that he was a convicted sex offender.  He further claims that he was subjected to the harsh punishment of restricted release and indefinite solitary confinement as a result of writing "[I] was coerced and forced to participate in a sex offender therapy program" on the SOTP document.

In Count Three, Mr. Curtis claims that his Fourteenth Amendment rights were violated when he was deprived of a liberty interest and substantive due process because he had never pleaded guilty or been convicted of a sexual offense.  He further claims that he was treated differently from other state prisoners who were convicted of sexual offenses but not forced to participate in SOTP programs or penalized with solitary confinement.  Finally, Mr. Curtis alleges that he suffered the stigmatizing effects of being labeled a sex offender in prison.

Initially, I note that all claims against the defendants in this action, movants and non-movants alike, in their official capacities are barred by the Eleventh Amendment[18] to the United States Constitution.  The United States Supreme Court has noted that the Eleventh Amendment presupposes that each state is a sovereign entity in our federal system and that, as a sovereign, it is not amenable to the suit of an individual without its consent.  Seminole Tribe of Fl. v. Fl., 517 U.S. 44, 54 (1996); see also United States v.

---

[18] The Eleventh Amendment provides:  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or Subjects of any Foreign State."  U.S. CONST. AMEND. XI.

Mitchell, 445 U.S. 535, 538 (1980) (The Eleventh Amendment precludes federal court jurisdiction over suits by private parties against states or their agencies unless sovereign immunity has expressly been waived).  The type of relief sought is irrelevant—the Eleventh Amendment bars an action against a state regardless of whether the plaintiff seeks legal or equitable relief.  Seminole Tribe, 517 U.S. at 58.  By statute, the Commonwealth of Pennsylvania has specifically withheld its consent to be sued, and Section 1983 does not override the Eleventh Amendment's sovereign immunity.  See 42 Pa. Cons. Stat. Ann. § 8521(b); see also Quern v. Jordan, 440 U.S. 332, 342 (1979); Laskaris v. Thornburgh, 661 F.2d 23, 25-26 (3d Cir. 1981) (The Eleventh Amendment further bars suit "against departments or agencies of the state having no existence apart from the state," as well as suits against a state official acting in his official capacity where retrospective relief, like damages, is being sought).  The doctrine of sovereign immunity extends to a state official in his official capacity because "it is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  Garden State Elec. Inspection Servs. v. Levin, 144 F.App'x 247, 251 (3d Cir. 2005) (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)).  In Will, the Supreme Court reaffirmed that a state and state officers acting in their official capacities are not "persons" against whom a claim for money damages under § 1983 can be asserted.  491 U.S. at 64.  Accordingly, based on this well-settled law, Mr. Curtis's Section 1983 claims against all the defendants in their official capacities will be dismissed from this action.

The defendants, however, are also being sued in their individual or personal capacities.  The Eleventh Amendment does not preclude a suit against a state official acting in his individual or personal capacity.  Hafer v. Melo, 502 U.S. 21, 31 (1991); Ex parte Young, 209 U.S. 123, 159-160 (1908); Koslow v. Pennsylvania, 302 F.3d 161, 168 (3d Cir. 2002).  It is also well-established, however, that personal liability under Section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior*. Rizzo v. Goode, 423 U.S. 362, 368 (1976); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1082 (3d Cir. 1976).  In order to state a Section 1983 claim against state employees in their individual capacities, a plaintiff must allege facts sufficient to raise a plausible inference that the defendants were personally involved in violating the plaintiff's constitutional rights.  See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs")).  Each named defendant must be shown, through the complaint's allegations, to have been personally involved in the events or occurrences upon which a plaintiff's claims are based. Hampton, 546 F.2d at 1082.  As the Court of Appeals for the Third Circuit stated in Rode:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.  Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

Rode, 845 F.2d at 1207.  Courts have also held that an allegation seeking to impose

liability on a defendant based on supervisory status, without more, will not subject the

official to Section 1983 liability.  Id. at 1208.

Here, Mr. Curtis fails to allege facts that, if proven, would show that the five

moving defendants had any sort of personal involvement in the conduct of which Mr.

Curtis complains.  He has not alleged that the moving defendants were involved either by

their personal direction or actual knowledge and acquiescence in their subordinates'

actions.  See Rode, 845 F.2d at 1207.

In fact, there are no allegations that these defendants had any affirmative

knowledge of Mr. Curtis's refusal to sign the SOTP form or his subsequent placement in

disciplinary custody.  Instead, in order to refute a statement in Defendant Kelly's

misconduct report that Defendants Wetzel and Klopotoski gave Mr. Curtis a "direct

order" to sign the SOTP document, Mr. Curtis emphatically insists that "during all times

relevant to the time intervals within this complaint, [Mr. Curtis] has never had any type

of contact with Defendant Wetzel" or "Defendant Klopotoski personally or any type of

direct communications or correspondence with Defendant Klopotoski" or "Defendant

Wetzel."  Compl. ¶¶ 42, 43, 44.  Thus, Mr. Curtis concedes that Defendants Wetzel and

Klopotoski had no affirmative knowledge or personal involvement in the attempt to force

Mr. Curtis to sign the form against his will or punish him for his refusal.

Mr. Curtis also claims that Defendant Wenerowicz "refused to direct the [Program

Review Committee] to submit the proper paperwork for [Mr. Curtis's] removal from the

Department of Corrections' penalties."  See Compl. ¶ 74.  Claiming that Defendant

Wenerowicz acquiesced in the other defendants' alleged unlawful action is a conclusion of law which cannot be accepted as true here.  Mr. Curtis further claims that Defendant Wenerowicz "'rubber stamped' acts predicated on a fraudulent misrepresentation of the records, intent to perpetrate the misleading of others, encompassing the Annual Case Review." Id.

Furthermore, using similar language, Mr. Curtis alleges that Defendant Lewis "rubber stamped" the penalty decisions of the Program Review Committee which were "predicated on a fraudulent misrepresentation of the records, intent to perpetrate the misleading of others." See Compl. at ¶ 76.  He further alleges that Defendant Shaylor ran interference and stifled "the processing of several valid grievances by repeatedly and incorrectly screening out [Mr. Curtis's] complaints preventing [him] from properly exhausting his claims." Id. at ¶ 77.

These allegations are insufficient to show the personal involvement of Defendants Wenerowicz, Lewis, and Shaylor in the complaint's challenged conduct.  Further, the alleged acts of Defendants Wenerowicz, Lewis, and Shaylor have no constitutional implications because "[p]risoners are not constitutionally entitled to a grievance procedure and the state creation of such a procedure does not create any federal constitutional rights." Wilson v. Horn, 971 F. Supp. 943, 947 (E.D. Pa. 1997), aff'd, 142 F.3d 430 (3d Cir. 1998).  A potential connection to Mr. Curtis's filing of grievances is not sufficient to show the actual knowledge necessary for personal involvement. Rode, 845 F.2d at 1208.  Mere concurrence in a prison administrative appeal process does not implicate a constitutional concern. Garfield v. Davis, 566 F. Supp. 1069, 1074 (E.D. Pa.

1983) (holding that administrative review of prison disciplinary hearings is not

constitutionally guaranteed and, therefore, plaintiff's claims with respect to the Program

Review Committee's decision did not rise to constitutional significance).

Accordingly, Mr. Curtis's Section 1983 claims in Counts One and Three will be

dismissed as to the five moving defendants in both their official and personal capacities.

### B.  Count Two – Violation of the Fifth Amendment

Mr. Curtis claims that the defendants ordered him to sign a Sex Offender

Treatment Plan form even though he had not pleaded guilty or been convicted of a sex

crime.  He argues that because he refused to sign the form, he was removed from the

general prison population and placed in the Restricted Housing Unit.  He further argues

that this punishment violated his Fifth Amendment right against self-incrimination.

The Fifth Amendment, incorporated and made applicable to the states through the

Fourteenth Amendment, prevents a State from compelling a person to incriminate

himself.  U.S. CONST. AMEND. V (providing that no person "shall be compelled in any

criminal case to be a witness against himself").  While the "privilege against self-

incrimination does not terminate at the jailhouse door . . . [a] broad range of choices that

might infringe constitutional rights in a free society fall within the expected conditions of

confinement of those who have suffered a lawful conviction."  McKune v. Lile, 536 U.S.

24, 36 (2002).  The Fifth Amendment right against self-incrimination applies not only in

criminal trials, but whenever the state seeks *to compel* an individual to be a witness

against himself and divulge information that might incriminate that person in future

criminal proceedings.  <u>Renchenski v. Williams</u>, 622 F.3d 315, 332 (3d Cir. 2010) (citing

<u>Minnesota v. Murphy</u>, 465 U.S. 420, 426 (1984)) (emphasis added).

In <u>Renchenski</u>, the Court of Appeals for the Third Circuit held that the plaintiff's

loss of his prison job and other consequences he faced for refusal to participate in the Sex

Offender Treatment Program would not rise to the level of compulsion which would

compel a prisoner to expose himself to criminal liability.  <u>Renchenski</u>, 622 F.3d at 335.

In addition to the loss of a job, those consequences included assignment to disciplinary

custody for ninety days, cell restriction for thirty days, suspension of the right to receive

visitors, and loss of privileges such as access to television, radio, and the commissary.  <u>Id.</u>

The court held that requiring a prisoner to admit to past sexual offenses or risk the

penalty of disciplinary custody does not violate the self-incrimination clause of the Fifth

Amendment.  It reasoned that in <u>McKune v. Lile</u>, 536 U.S. 24 (2002), at least five

Justices rejected the argument that loss of privileges, such as access to television and

radio, as well as suspension of the right to receive visitors, constituted compulsion for

Fifth Amendment purposes.  <u>Renchenski</u>, 622 F.3d at 335.

Here, Mr. Curtis alleges very similar consequences to those experienced by Mr.

Renchenski for failure to participate in the sex offender program.  He alleges that, in

addition to being threatened with solitary confinement or being placed on the restricted

release list, he was denied phone calls, radio, and television; he was also denied access to

course study; his visits were limited to immediate family members; and his commissary

purchases were "extremely limited."  <u>See</u> Compl. ¶ 51.  As the court found in

<u>Renchenski</u>, these consequences do not rise to the level of compulsion which would

15

compel a prisoner to expose himself to criminal liability.  Accordingly, I will grant the portions of the defendants' motions which seek to dismiss Count Two from the complaint in its entirety.

### C.  Counts Four, Five, & Six – State Law Claims

1.  <u>Count Four – 37 Pa. Code § 93.11(b)</u>

In Count Four, Mr. Curtis alleges a violation of his rights under 37 Pa. Code § 93.11(b), which provides:

> Confinement in a restricted housing unit (RHU), ***other than under procedures established for inmate discipline***, will not be done for punitive purposes. The Department will maintain written procedures which describe the reasons for housing an inmate in the RHU and require due process in accordance and with established principles of law for an inmate who is housed in the RHU. Inmates confined in the RHU will be reviewed periodically by facility staff.

37 Pa. Code § 93.11(b) (emphasis added).  Specifically, Mr. Curtis alleges that his rights under the above section of the Pennsylvania Code to be free from punitive Administrative Custody and confinement were violated when "Defendants Bolton and Kelly logged into the institution's computer for inmate records as an act of retaliation and personal animus against Plaintiff and changed his status from Administrative Custody to Disciplinary Custody status for punitive punishment."  <u>See</u> Compl. ¶¶ 50, 84-85.  Initially, I note that none of the five moving defendants were named as being involved in this alleged conduct.  Further, 37 Pa. Code § 93.11(b) provides that confinement in the restricted housing unit will not be done for punitive purposes, ***other than under procedures established for inmate discipline***.  Mr. Curtis was in fact being disciplined during his

16

stay in the restrictive housing unit.  Although the disciplinary misconduct report issued

by Defendant Kelly was dismissed without prejudice following a hearing, Mr. Curtis

remained in the restrictive housing unit based upon Defendant Regan's "Other Report

DC-ADM 802," which indicated that Mr. Curtis was a danger to some person in the

institution who could not be protected by alternate means.  Accordingly, Mr. Curtis's

attempt to base his claim on a violation of 37 Pa. Code § 93.11(b) when he was being

disciplined must fail under the clear language of the Code, and I will grant the motions to

dismiss the five moving defendants from Count Four.

### 2. Count Five – 63 P.S. § 1203, Chapter 41

In Count Five, Mr. Curtis alleges that the defendants violated his rights under

various subsections of 63 P.S. § 1203, Chapter 41, allegedly known as the Professional

Psychologists Practice Act.  Initially, I note that Mr. Curtis seems to have confused a

section of the Pennsylvania Statutes with a section of the Pennsylvania Administrative

Code.  The Professional Psychologists Practice Act is found at Title 63 of the

Pennsylvania Statutes, Chapter 26, and not Chapter 41 as he alleges.  His specific claims,

however, are cited as violations of §§ 41.57, 41.59, and 41.61 which are found in Chapter

41 of the Pennsylvania Administrative Code pertaining to Pennsylvania's State Board of

Psychology.  For example, Mr. Curtis cites a violation of § 41.57 pertaining to a

Psychologist's professional records; specifically "acts and abuse contrary to acts of good

faith," and "acts outside the scope of their duty."  He also cites a violation of § 41.59

pertaining to a Psychologist's continuing education; specifically "acts and abuse contrary

to acts of good faith," and "acts outside the scope of their duty."  Finally, he cites a

violation of § 41.61 pertaining to a Psychologist's Code of Ethics; specifically, "acts and abuse contrary to acts of good faith," and "acts outside the scope of their duty."

None of the five moving defendants have been shown to be licensed psychologists, and thus are not covered by this chapter of the Pennsylvania Administrative Code.  Defendant Wetzel is the Commissioner of the Pennsylvania Department of Corrections.  Defendant Klopotoski is listed as the Deputy Secretary of the Pennsylvania Department of Corrections.  Defendant Wenerowicz is listed as the Superintendent at SCI-Graterford.  Defendant Lewis is listed as the Chief Hearing Examiner for the Pennsylvania Department of Corrections.  Finally, Defendant Shaylor is a Grievance Coordinator at SCI-Graterford.  Accordingly, because none of the moving defendants are covered by these sections of the Pennsylvania Administrative Code pertaining to Psychologists, I will grant their motions to dismiss them from Count Five.

### 3. Count Six – Counselors

Finally, in Count Six, Mr. Curtis alleges that the defendants violated his rights under various subsections of Pennsylvania's Administrative Code pertaining to the Pennsylvania State Board of Social Workers, Marriage and Family Therapists, and Professional Counselors.  First, he claims the Code gives him rights to be free from violations of 49 Pa. Code § 49.32 pertaining to a Counselor's requirement of biennial renewal; specifically "acts and abuse contrary to acts of good faith," and "acts outside the scope of their duty."  Second, he cites violations of 49 Pa. Code § 49.71 pertaining to a Counselor's code of ethical practice and professional conduct; specifically "acts and abuse contrary to acts of good faith," and "acts outside the scope of their duty."  Third, he

18

cites violations of 49 Pa. Code § 49.72 pertaining to a Counselor's responsibilities to clients/patients; specifically "acts and abuse contrary to acts of good faith," and "acts outside the scope of their duty." Fourth, he cites violations of 49 Pa. Code § 49.78 pertaining to a Counselor's record keeping; specifically, "acts and abuse contrary to acts of good faith," and "acts outside the scope of their duty." Finally, he cites violations of 49 Pa. Code § 49.79 pertaining to mandatory reporting; specifically, "acts and abuse contrary to acts of good faith," and "acts outside the scope of their duty."

None of the five moving defendants have been shown to be licensed social workers, marriage and family therapists or professional counselors, and thus are not covered by this chapter of the Pennsylvania Administrative Code. Accordingly, I will grant their motions to dismiss them from Count Six.

An appropriate Order follows.